OSCN Found Document:MOORE v. WARR ACRES NURSING CENTER, LLC.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 MOORE v. WARR ACRES NURSING CENTER, LLC.
2016 OK 28
Case Number: 113098
Decided: 03/08/2016
As Corrected: March 9, 2016
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2016 OK 28, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 



DONALD DEWAYNE MOORE, Plaintiff/Appellant,
v.
WARR ACRES NURSING CENTER, LLC., Defendant/Appellee.

APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
Honorable Barbara G. Swinton, Trial Judge

¶0 The Warr Acres Nursing Center terminated the employment of the plaintiff, Donald Dewayne Moore, after he called in sick with influenza. The employee filed a complaint in the District Court of Oklahoma County, alleging that he had been fired in violation of public policy. The trial court granted summary judgment to the employer and we retained the appeal. We hold that terminating a licensed practical nurse for missing work in a nursing center while infected with influenza would violate public policy, but disputed facts exist as to the reason for termination which preclude summary judgment.

TRIAL COURT REVERSED. 

Marilyn D. Thomson, Oklahoma City, Oklahoma, for Appellant.
Daniel J. Hoehner, Oklahoma City, Oklahoma, for Appellee.


KAUGER, J.,:
¶1 We retained this cause to address the dispositive issue of whether terminating a licensed practical nurse for missing work in a nursing center based on vomiting on the job and a doctor's note admitting that he should not work for three days due to an infection with influenza would violate public policy.[1] We hold that it would. The public policy behind precluding a nursing home employee from working while infected with influenza is manifested in the Oklahoma Constitution, the Oklahoma statutes, Oklahoma and Federal regulations and caselaw. To hold otherwise would exacerbate communicable disease and expose the most vulnerable people. However, the reason for termination of this employee may have had nothing to do with whether he missed work with the flu.
¶2 At-will employment is not in jeopardy or threatened under these facts. Under the alleged facts, this at-will employee could have been legally terminated by the employer. The employee's disciplinary record at the nursing center shows he was written up at least five times for disregarding and failing to follow supervisor's instructions, spreading rumors, failing to complete tasks, and rebellious behavior. One employee stated that he was belligerent when he found out he was not on the work schedule. The employee's employment history appears to show a pattern of constantly moving from one job to another. This job appears to have been his seventh in seven years. These facts may reflect that the termination was neither pretextual, post hoc rationalization, nor a violation of public policy. Nevertheless, that issue is for the jury to decide.
FACTS
¶3 The plaintiff/appellant, Donald Dewayne Moore (Moore/employee) worked for the defendant/appellee Warr Acres Nursing Center (employer/Nursing Center) as a licensed practical nurse. Moore began employment around January 17, 2008. Moore, became acutely ill with the influenza while working on November 25, 2008. The Nursing Center's director of nursing overheard Moore vomiting at the Nursing Center. She stated that he did not look good and that he must have a virus or the flu and she told him to go home. After continuing to experience symptoms on the way home, he went directly to his physician at the Department of Veterans Affairs for treatment. His physician treated him and issued a written notice taking him off work for three days due to his illness.[2]
¶4 According to Moore, he followed the Nursing Center's handbook procedures[3] and called the on-call scheduler and reported his illness and his doctor's directive, even though he was not scheduled, he also offered to work the upcoming weekend providing that he had recovered. Otherwise, Moore informed the scheduler that he would report to work Monday, and that he would bring his doctor's note. On November 26, 2008, the Nursing Center's director of nursing called Moore and he repeated the information he had previously given the scheduler.
 
¶5 When the employee arrived at the Nursing Center on Sunday, November 30, 2008, to deliver his doctor's note, he discovered that he had been crossed off of the work schedule for the week of December 1, 2008 and he was subsequently discharged on December 3, 3008. On April 15, 2010, the employee filed a lawsuit against the nursing center alleging that he was discharged for not being at work while suffering from influenza. He insisted that his discharge was unlawful and wrongful as against public policy and against the Workers Compensation Act (the Act).[4]
¶6 On May 6, 2010, the employer filed a motion to dismiss the employee's lawsuit. The employer sought dismissal for failure to state a claim under the Act for which relief could be granted and failure to articulate a clear public policy which the employer violated. After a hearing on June 18, 2010, the trial court granted the employer's motion to dismiss for failure to state a claim upon which relief can be granted and the order of dismissal was filed on July 13, 2010.
¶7 The employee appealed, and the Court of Civil Appeals, in an unpublished opinion filed on December 8, 2010, reversed and remanded with instructions. It upheld the trial judge's dismissal of the workers compensation claim. However, it stated that a number of statutes, Acts, and regulations of this State that may well articulate a public policy of prohibiting a health care worker from interacting with nursing home patients while having a communicable disease such as influenza. Nevertheless, the court noted that the employee had neglected to provide the specific legal authorities which would support such a public policy.
¶8 The Court of Civil Appeals remanded the matter to the trial court, holding that the employee should have been given the opportunity to amend his petition and be afforded the opportunity to show with particularity the public policies upon which he relied and which he contended were violated by his termination. We denied certiorari in that appeal on February 14, 2011. The employee filed his first amended petition on March 13, 2011.
¶9 Pursuant to the Court of Civil Appeals instructions, the employee referenced Silver v. CPC-Sherwood Manor, Inc. 2004 OK 1, 84 P.3d, 728, 63 O.S. 2011 §§1-1900.1 et seq (the Nursing Care Act; 63 O.S. 2011 §§ 1-819 et seq. (The Residential Care Act); Infection Control Regulations from the Department of Health, 310:675-7-17.1 as well as federal regulations 42 CFR Ch. V., Pt. 483, §483 (Infection Control) and §483.65, §483.75, and Oklahoma Regulations, 9 OK Reg 3163, 10 OK Reg 1639, 24 OK Reg. 2030, 25 OK Reg. 2382.
¶10 The employer, on March 23, 2011, again attempted to have the lawsuit dismissed and on April 18, 2011, the employee submitted 17 supplemental exhibits in opposition to the employer's motion to dismiss. These exhibits included copies of specific statutes, state and federal regulations and guidelines as well as caselaw, all of which will be discussed herein.[5] The exhibits were not merely broad references to whole acts, but rather were specific sections with the applicable provisions underlined, so that the trial court could easily identify them. The trial court again dismissed the case for failure to state a claim upon which relief could be granted on May 12, 2011. The employee again appealed.
¶11 The Court of Civil Appeals, in another unpublished opinion filed April 10, 2012, again reversed and remanded for further proceedings. It held that unquestionably, the employee shouldered the initial burden of proof by providing a well-pled cause of action sufficient to withstand a motion to dismiss. However, once he submitted evidentiary material to the trial court, the analysis should have proceeded as one for summary judgment, placing the burden on the employer to prove no material facts were in dispute and only a pure question of law remained. We denied certiorari on May 29, 2012.
¶12 By December 5, 2013, after various pleadings and discovery requests were filed, the employee filed a motion to set the case for a jury trial. Discovery and depositions continued until the employer filed a motion for summary judgment on April 10, 2014, arguing that there is no clear violation of a compelling public policy. For purposes of the summary judgment motion, the employer admitted all of the facts that the employee alleged and accepted them as true, but still insisted no cause of action existed. The trial court held a hearing on the motion for summary judgment on May 2, and June 13, 2014. At the June 13, 2014, hearing, the trial court said:


All right. Given that we've had the discovery of the key witness that had the authority to develop policy for the defendant, and because the defendant, Warr Acres Nursing Center, no longer is a ongoing facility I'll find that there is no public policy to prevent the termination of Mr. Moore, or a violation of public policy upon the termination of Mr. Moore and sustain the summary judgment.
The journal entry reflecting the June 13, 2014, ruling was filed July 3, 2014. The employee appealed on August 1, 2014, and we retained the cause on October 2, 2014, addressing the public policy exception to at-will employment. (It should be noted that the fact that Warr Acres Nursing Center, L.L.C., is no longer in operation does not preclude the employee from seeking a remedy, although it may affect what Moore would be able to recover.[6])
I.
BECAUSE THE RECORD REFLECTS DISPUTED FACTS EXIST AS TO
THE REASONS FOR TERMINATION WHICH WERE NEITHER
PRETEXTUAL, POST HOC RATIONALIZATIONS, NOR VIOLATIONS
OF PUBLIC POLICY SUMMARY JUDGMENT WAS INAPPROPRIATE.
¶13 Pursuant to Rule 13, 12 O.S.2011, Ch. 2 App., Rules for the District Courts, a motion for summary judgment may be filed if the pleadings, depositions, interrogatories, affidavits, and other exhibits reflect that there is no substantial controversy pertaining to any material fact.[7] A party opposing the motion may file a written statement showing that a genuine controversy exists. Affidavits and other evidentiary materials which are admissible at trial may be attached in support of these facts. Even when basic facts are undisputed, motions for summary judgment should be denied, if under the evidence, reasonable persons might reach different inferences or conclusions from the undisputed facts.[8] Summary judgment is proper only when the pleadings, affidavits, depositions, admissions or other evidentiary materials establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.[9] All conclusions drawn from the evidentiary material submitted to the trial court are viewed in the light most favorable to the party opposing the motion.[10]
¶14 The alleged facts show that this at-will employee could certainly have been legally terminated by the employer. Given the employee's disciplinary record at the nursing center, failure to follow supervisor's instructions, spreading rumors, failure to complete tasks, and rebellious behavior, the termination likely was neither pretextual, post hoc rationalization, nor a violation of public policy. Oklahoma follows the at-will employment doctrine which allows an employer to discharge an employee for good cause, for no cause without being guilty of legal wrong.[11] However, summary judgment was granted based on finding there was no violation of public policy not on the employee's employment history or for no cause. Instead, for the purpose of summary judgment, the employer insisted that no cause of action existed. There are material questions of fact for the jury to decide.
 
II.
OKLAHOMA PUBLIC POLICY CLEARLY ARTICULATES THAT A NURSE CANNOT BE FIRED SOLELY FOR MISSING WORK DUE TO
AN INFLUENZA INFECTION.
¶15 For summary judgment purposes, the employer admits and accepts the employee's version of the facts. The Nursing Center argues, that as a matter of law, the employee has no claim against it because the employee was an at-will employee. The employee insists that he was fired solely for not working with the flu and that this is an exception to at-will employment as articulated by Burk v. K-Mart Corp., 1989 OK 22, ¶17, 770 P.2d 24 and its progeny.
¶16 Burk involved a federal certified question concerning an alleged "implied obligation of good faith and fair dealing" in reference to termination of any employment-at-will contract. The Burk employee sued her employer in contract and in tort, alleging that she was prevented from performing her job duties and was, consequently, constructively discharged. She further asserted that her employer's agent told her he would not recommend her for a promotion because of her sex.
¶17 Although the Court rejected the implication of a duty of good faith and fair dealing in every employment-at-will contract, Burk was the landmark case wherein the Court adopted a public policy exception to the at-will termination rule in a narrow class of cases in which the discharge of an employee is contrary to the clear mandate of public policy as articulated by constitutional, statutory, or decisional law. We recognized, for the first time, that the action was a tort. We also noted that because the term "public policy" was vague, the exception had to be tightly circumscribed.[12]
¶18 In Clinton v. State of Oklahoma ex rel. Logan County Election Board, 2001 OK 52, ¶10, 29 P.3d 543, the Court also clarified the parameters of the Burk tort remedy, noting that:
 


1) the plaintiff must identify an Oklahoma public policy goal that is clear and compelling and is articulated in existing Oklahoma constitutional, statutory or jurisprudential law;
2) the existence of a federal statutory remedy or state statutory remedy which is sufficient to protect the identified Oklahoma public policy goal precludes a Burk tort;
3) the plaintiff must establish he or she is an at-will employee and the reason for discharge violates the identified Oklahoma public policy goal;
4) a discharge for purposes of the Burk tort may be either actual or constructive.
¶19 We again addressed the elements of a Burk tort in Vasek v. Board of County Commissioners, 2008 OK 35, ¶¶27-28, 186 P.3d 928. It involved a plaintiff who alleged wrongful termination for making a complaint to the Department of Labor (DOL) concerning mold at the courthouse. The plaintiff's action was based on the fact that she alleged she was fired for reporting her employer's violation of the law. We reiterated the elements of a Burk tort in such circumstances, stating:


The elements of a claim for wrongful discharge of an at-will employee articulated in Burk and its progeny can be summarized. A viable Burk claim must allege (1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal.
¶20 In Vasek, we equated "adequacy" of remedies with "sufficiency," in other words: Were the remedies available to the plaintiff sufficient to protect Oklahoma's public policy goals? In this cause, the precise question of law is not the employee's sufficiency of remedies, but rather whether Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision even prescribes a norm of conduct for Oklahoma that was violated. The answer is overwhelmingly and clearly yes.
¶21 In Silver v. CPC-Sherwood Manor, Inc., 2004 OK 1, 84 P.3d 728, we recognized that a cook for a nursing home who was fired for going to the emergency room with diarrhea and throwing up stated a cause of action by showing a public policy violation of the Oklahoma Administrative Code provisions of the Oklahoma State Department of Health. We noted that the public health codes "in a clear and compelling fashion," articulate a well-defined, firmly established, state public policy prohibiting the holding, preparing, or delivering of food prepared under conditions whereby it may have been rendered diseased, unwholesome, or injurious to health.
¶22 The nursing home's alleged failure to follow this policy stated a cause of action under Burk sufficient to survive a motion to dismiss for failure to state a claim. Yet, we expressed no opinion as to the sufficiency or quality of the plaintiff's evidence, yet to be presented, concerning the nursing home's reason for dismissing the cook. The dissenters in Silver, did not join the majority opinion because there was no doctor's diagnosis of a communicable disease. There is such a note in the present case.
¶23 Similar public health codes in a clear and compelling fashion, also articulate a well-defined, firmly established, state public policy prohibiting a nurse from working while infected with the influenza. The Okla. Const. art. 5 §39 directs the legislature to create the Board of Health[13] and art. 5 vests the Legislature the power to establish agencies such as the Oklahoma Health Department and to designate agency functions.[14] The Legislature delegates rule making authority to facilitate administration of legislative policy and such delegation is intended to eliminate the necessity of establishing every administrative aspect of general public policy by legislation.[15] Administrative agencies create rules which are binding similar to a statute and are only created within legislatively-granted authority and approval. Such rules are necessary in order to make a statutory scheme fully operative.[16]
¶24 In Estes v. Conoco Phillips Co., 2008 OK 21, ¶10, 184 P.3d 518 we recognized that: 1) pursuant to the Administrative Procedures Act, 75 O.S. 2011 §§250-323, the Legislature may delegate rulemaking authority to agencies, boards, and commissions to facilitate the administration of legislative policy; and 2) Administrative rules are valid expressions of lawmaking powers having the force and effect of law.
¶25 The Oklahoma Department of Health Regulations §310:675-7-17-1, which were statutorily mandated[17] to implement the Nursing Home Care Act,[18] to cover infection control and require nursing home facilities to have an infection control policy to provide a safe and sanitary environment. This policy is required to include provisions excluding personnel and visitors with communicable infections[19] as well as to ensure the health of its residents.[20] A nurse's license may be withdrawn for failing to follow minimum quality of care standards.[21]
¶26 In addition to the Oklahoma statutory directives, Federal law regulates the states, including Oklahoma, when it comes to infectious disease control. For example, the regulation governing medicare & medicaid services requires facilities to control infectious diseases by prohibiting employees with communicable disease to come in direct contact with residents.[22] Federal quality of care standards also require development of policy and procedures to ensure that residents in a nursing home are protected from influenza and pneumonia.[23] Nursing facilities must comply with all Federal, State, and local laws regarding regulations and professional standards of care.[24]
¶27 Clearly, it cannot be said the there are not constitutional, statutory or caselaw public policy manifestations which would prohibit a registered nurse from working with the flu. The present cause is just like Silver, supra. In Silver, a nursing home cook was fired for missing work because he suffered with a virus, even though statutes prohibited nursing home food to be prepared under conditions whereby it may have been unwholesome or injurious to health.[25] Here, a nurse was fired for missing work because he suffered with a virus even though health codes prohibited nurses from working while infected with influenza.
 
¶28 Title 63 O.S. 2011 §1-1102 and §1-109[26] prohibit the handling of food which may have been rendered diseased, unwholesome, or injurious to health. The Oklahoma Department of Health Regulations §310: 675-17-1 require the exclusion of personnel and visitors with communicable infections in nursing homes.[27] The Nursing Center provided the employee's job description in its motion for summary judgment. It required him to check foods brought into the facility, make sure they were appropriate according to order and allowances, report dietary changes, and assist in infection control to ensure that tasks in which there is a potential exposure were properly identified.[28] The statutes, coupled with his job description, put this employee in a better position than Silver. The only difference between this cause and Silver is that in this cause, the employee suffered from a communicable disease diagnosed by a doctor. The reason for the dissenting opinion in Silver was because the employee was not diagnosed by a doctor as having a communicable disease. Stare decisis and consistent jurisprudence compel this conclusion. Otherwise, we must overrule Silver v. CPC-Sherwood Manor, Inc., 2004 OK 1, 84 P.3d 728,
¶29 There were over 100 people who died in Oklahoma from the flu last year. Obviously precautions must be taken to prevent the transfer of such a communicable and potentially deadly disease. A recap of Clinton v. State of Oklahoma ex rel. Logan County Election Board, 2001 OK 52, ¶10, 29 P.3d 543, which sets the parameters of the Burk tort remedy is compelling. It requires that:


1) the plaintiff must identify an Oklahoma public policy goal that is clear and compelling and is articulated in existing Oklahoma constitutional, statutory or jurisprudential law;
[The employee furnished a plethora of legal authorities delineating public policy goals.]
2) the existence of a federal statutory remedy or state statutory remedy which is sufficient to protect the identified Oklahoma public policy goal precludes a Burk tort;
[There is no federal or state remedy. The public policy exception was recognized in Silver v. CPC-Sherwood Manor, Inc., 2004 OK 1, 84 P.3d 728.]
3) the plaintiff must establish he or she is an at-will employee and the reason for discharge violates the identified Oklahoma public policy goal;
[The employee has established that he is an at-will employee. If, it were to be found by the trier of facts that his absence due to influenza was the reason for his termination, it would violate Oklahoma public policy.]
4) a discharge for purposes of the Burk tort may be either actual or constructive.
[It was undisputed that he was discharged.]
¶30 Accordingly, based on the constitution, the statutes, the regulations approved by Congress and the Oklahoma Legislature, and the Nursing Center's rules, regulations and handbook, a public policy exception exists which would prohibit a nurse from being fired solely for not working while infected with influenza. This is an exception to at-will employment as articulated by Burk v. K-Mart Corp., 1989 OK 22, ¶17, 770 P.2d and its progeny. This holding, however does not end the inquiry of this cause because disputed facts are alleged which show that the firing had nothing to do with not working with the flu.
CONCLUSION
¶30 Summary judgment was inappropriate. Oklahoma as well as federal law clearly shows that a nurse in a nursing center cannot be fired for not working with the flu. However, the disputed facts show that this employee's firing may have had very little to do with his three-day absence from work with the flu.

TRIAL COURT REVERSED. 

REIF, C.J., COMBS, V.C.J., KAUGER, WATT, EDMONDSON, COLBERT, GURICH, JJ., concur.
WINCHESTER, (by separate writing) and TAYLOR, JJ., dissent.

FOOTNOTES

[1] In his Third Amended Petition in Error, the appellant attaches an exhibit listing 50 issues to be raised on appeal. Included in that exhibit are many arguments and authorities Appellant had not previously presented to the trial court in his motion to vacate the grant of summary judgment and the Appellee has moved to strike most of the exhibit, arguing it violates the rules of accelerated procedure for summary judgement. We agree. Okla. Sup. Ct. Rule 1.36, 12 O.S. 2011 App. 1.

[2] The note is signed from Dr. Quang Van Pham, a Staff Physician at the Department of Veterans Affairs Medical Center in Oklahoma City, Oklahoma, dated November 25, 2008 and it provides:
To Whom It May Concern:
Mr. Moore may return to work in three days.
Please contact me for further assistance.

[3] The Warr Acres Nursing Center Handbook provides:
Absenteeism
All employees are expected to report to work as scheduled on time. It is the responsibility of the employee to notify her/his supervisor when illness or other circumstances prevent them from reporting to work. Please note that you must call your SUPERVISOR not a peer.
Except in a life-threatening emergency, all employees must personally call their supervisor two (2) hours before his/her inability to report to work. No Call No Show is a CRITICAL violation and may result in termination per policy.
Upon your return to work, you will be asked for the reason of absence which will be documented and put into your personnel record. The facility reserves the right to request proof of the reason for absenteeism, ie. a written physician's statement, death notice, etc. [It appears the employee underlined the most relevant portions in order for the trial court to easily identify them.]

[4] Title 85 O.S. Supp. 2011 §§ 1 et. seq The current version is known as the Administrative Workers Compensation Act, 85A O.S. Supp. 2013 §§1 et seq.

[5] The exhibit list includes: Oklahoma Department of Health Regulation §310: 675-7-17-1 governing infection control in nursing homes; 42 Code of Federal Regulation §483.65, governing facilities which provide medicare & medicaid services; 42 CFR §483.25(n), quality of care, 59 O.S. §567.8 (Nursing Practice Act) 42 CFR §483.75, compliance with local laws and standards; Silver v. CPC-Sherwood Manor, Inc, 2004 OK 1, 84 P.3d 728, Moore v. Warr Acres Nursing Center, LLC, No. 108,595, prior appeal; Warr Acres Nursing Center's Employee Handbook, a Physician's written statement taking the employee off work for three days; 42 CFR §§70.1(a)-(d) providing the definition of communicable diseases; 45 CFR §482.42 conditions of participation in Medicare/Medicaid; Band v. Baptist Village Retirement Communities of Oklahoma, Inc., 2009 WL 5216927 (N.D. Okla. 12-30-2009); U.S. Government Operations Manual for all states to regulate compliance with long term care facilities.

[6] The Nursing Center is a L.L.C. which is apparently no longer in business. Title 18 O.S. 2011 §2037(B) provides that:
B. A limited liability company continues in existence after dissolution, regardless of whether articles of dissolution are filed, but may carry on only activities necessary to wind up its business or affairs and liquidate its assets under Sections 2039 and 2040 of this title.
Title 18 O.S. 2011 §2039(A)(2) provides:
2. The persons winding up the business or affairs of the limited liability company may, in the name of, and for and on behalf of, the limited liability company:
a. prosecute and defend suits,
b. settle and close the business of the limited liability company,
c. dispose of and transfer the property of the limited liability company,
d. discharge the liabilities of the limited liability company, and
e. distribute to the members any remaining assets of the limited liability company.

[7] Rules for District Courts of Oklahoma, Rule 13 12 O.S. 2011, Ch. 2, App., provides in pertinent part:
a. A party may move for either summary judgment or summary disposition of any issue on the merits on the ground that the evidentiary material filed with the motion or subsequently filed with leave of court show that there is no substantial controversy as to any material fact. The motion shall be accompanied by a concise written statement of the material facts as to which the movant contends no genuine issue exists and a statement of argument and authority demonstrating that summary judgment or summary disposition of any issues should be granted. Reference shall be made in the statement to the pages and paragraphs or lines of the evidentiary materials that are pertinent to the motion. Unless otherwise ordered by the court, a copy of the material relied on shall be attached to or filed with the statement. . . .
c. The affidavits that are filed by either party shall be made on personal knowledge, shall show that the affiant is competent to testify as to the matters stated therein, and shall set forth matters that would be admissible in evidence at trial. The admissibility of other evidentiary material filed by either party shall be governed by the rules of evidence. If there is a dispute regarding the authenticity of a document or admissibility of any submitted evidentiary material, the court may rule on the admissibility of the challenged material before disposing of the motion for summary judgment or summary disposition. A party challenging the admissibility of any evidentiary material submitted by another party may raise the issue expressly by written objection or motion to strike such material. Evidentiary material that does not appear to be convertible to admissible evidence at trial shall be challenged by objection or motion to strike, or the objection shall be deemed waived for the purpose of the decision on the motion for summary judgment or summary disposition. If a trial of factual issues is required after proceedings on a motion for summary judgment or summary disposition, evidentiary rulings in the context of the summary procedure shall be treated as rulings in limine. . . .
e. If it appears to the court that there is no substantial controversy as to the material facts and that one of the parties is entitled to judgment as a matter of law, the court shall render judgment for said party. . . .

[8] Brown v. Oklahoma State Bank & Trust Company of Vinita, 1993 OK 117, ¶7, 860 P.2d 230.

[9] Brown v. Oklahoma State Bank & Trust Company of Vinita, see note 8, supra.

[10] Brown v. Oklahoma State Bank & Trust Company of Vinita, see note 8, supra.

[11] City of Jenks v. Stone, 2014 OK 11, ¶13, 321 P.3d 179.

[12] Three years after Burk, we promulgated Tate v. Browning Ferris, Inc, 1992 OK 72, 833 P.2d 1218. Tate involved the question of whether a Burk tort could be asserted for racial discrimination, to which we answered -- yes. The history and evolution of the Burk tort is detailed in our opinion in Kruchowski v. Weyerhaeuser Company, 2008 OK 105, 202 P.3d 144.

[13] The Okla. Const. art. 5 §39 provides:
Boards of Health, Dentistry and Pharmacy - Pure Food Commission - Present practitioners.
The Legislature shall create a Board of Health, Board of Dentistry, Board of Pharmacy, and Pure Food Commission, and prescribe the duties of each. All physicians, dentists and pharmacists now legally registered and practicing in Oklahoma and Indian Territory shall be eligible to registration in the State of Oklahoma without examination or cost.

[14] Title 75 O.S. Supp. 2013 §250.2(A) provides:
A. Article V of the Oklahoma Constitution vests in the Legislature the power to make laws, and thereby to establish agencies and to designate agency functions, budgets and purposes. Article VI of the Oklahoma Constitution charges the Executive Branch of Government with the responsibility to implement all measures enacted by the Legislature.

[15] Title 75 O.S. Supp. 2013 §250.2(B) provides:
B. In creating agencies and designating their functions and purposes, the Legislature may delegate rulemaking authority to executive branch agencies to facilitate administration of legislative policy. In so doing, however, the Legislature reserves to itself:
1. The right to retract any delegation of rulemaking authority unless otherwise precluded by the Oklahoma Constitution;
2. The right to establish any aspect of general policy by legislation, notwithstanding any delegation of rulemaking authority;
3. The right and responsibility to designate the method for rule promulgation, review and modification;
4. The right to approve or disapprove any adopted rule by joint resolution; and
5. The right to disapprove a proposed permanent, promulgated or emergency rule at any time if the Legislature determines such rule to be an imminent harm to the health, safety or welfare of the public or the state or if the Legislature determines that a rule is not consistent with legislative intent.

[16] See, Estes v. Conoco Phillips Co., 2008 OK 21, ¶10, 184 P.3d 518 [Pursuant to the Administrative Procedures Act, 75 O.S. 2001 §§250-323, the Legislature may delegate rulemaking authority to agencies, boards, and commissions to facilitate the administration of legislative policy. Administrative rules are valid expressions of lawmaking powers having the force and effect of law.]; See Chevron, U.S.A, Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.ED.2d 694 for discussion of the controlling weight given to an administrative agency and administrative agency's power and necessity to formulate policy and fill any gaps left implicitly or explicitly by Congress; Been v. O.K Industries, Inc., 495 F.3d 1217, 1226 [Regulations promulgated by an agency exercising its congressionally granted rule-making authority are entitled to Chevron deference and have the ful force of law.].

[17] In addition to specifically implementing the Nursing Home Care Act, required the State Board of Health to promulgate rules and establish procedures for nursing facilities. For example, 63 O.S. 2011 §1-1942 provides:
The Department shall have the power to adopt rules and regulations in furtherance of the purpose of this act.
Title 63 O.S. 2011 §1-1900.2 provides:
A. It is the intent of the Legislature to foster the development of resident autonomy, individualization and culture change in nursing facilities licensed by the State Department of Health.
B. The Commissioner of Health is authorized to waive any provision of the Nursing Home Care Act and any rules promulgated pursuant thereto, provided:
1. The waiver will not cause the State of Oklahoma to fail to comply with any applicable requirements established by the Centers for Medicare and Medicaid Services;
2. The waiver is granted to allow a nursing facility to satisfy the spirit of a statutory or administrative requirement by alternative means;
3. The waiver will not adversely affect the health, safety or welfare of any resident of a nursing facility; and
4. The waiver is in support of a deinstitutionalization model that restores individuals to a self-contained residence in the community that is designed like a private home and houses no more than twelve individuals.
C. The State Board of Health shall promulgate rules and establish procedures necessary to implement the waiver process established by this section.
Title 63 O.S. 2011 §1-836 provides in pertinent part:
A. The State Board of Health shall promulgate rules to enforce the provisions of the Residential Care Act. Such rules shall regulate:
1. Location and construction of the home, including plumbing, heating, lighting, ventilation, and other physical conditions which shall ensure the health, safety, and comfort of residents and protection from fire hazards;
2. Number of all personnel, including management and supervisory personnel, having responsibility for any part of the care given to residents. The Department shall establish staffing ratios for homes which shall specify the number of staff hours of care per resident that are needed for care for various types of homes or areas within homes. Minimum personnel ratio requirements for all homes shall be based only on average daily census;
3. All sanitary conditions within the home and its surroundings, including water supply, sewage disposal, food handling, and general hygiene, which shall ensure the health and comfort of residents; . . .

[18] Oklahoma Department of Health Regulation §310: 675-1-1 Purpose, provides:
The purpose of this Chapter is to implement the 'Nursing Home Care Act' (63 O.S. 1991 §§ 1-1901 et seq.) And to establish the minimum criteria for the issuance or renewal of a nursing or specialized facility license.
Title 63 O.S. 2011 §1-1900.1 was added in 2001 and it provides:
A. This act shall be known and may be cited as the "Long-Term Care Reform and Accountability Act of 2001".
B. The purpose of the Long-Term Care Reform and Accountability Act of 2001 shall be to design, develop and implement policies and procedures that improve the quality of care provided in this state's long-care delivery system for the elderly and disabled. The purpose of the Long-Term Care Reform and Accountability Act of 2001 shall be accomplished through a series of initiatives.
The short title of the act is found in §1-1901 and it provides:
This act shall be known and may be cited as the "Nursing Home Care Act".

[19] Oklahoma Department of Health Regulations §310: 675-17-1 provides in pertinent part:
(a) The facility shall have an infection control policy and procedures to provide a safe and sanitary environment. The policy shall address the prevention and transmission of disease and infection. The facility, and its personnel, shall practice the universal precautions identified by the Centers for Disease Control. All personnel shall demonstrate their knowledge of universal precautions through performance of duties.
(b) The facility shall maintain a sanitary environment and prevent the development and transmission of infection in the following areas.
. . .
(7) Sources of air-borne infections.
(8) Health status of all employees and residents. . . .
(c) Infection control policies to prevent the transmission of infection shall include the following:
(1) Excluding personnel and visitors with communicable infections. . . .
Federal guidelines define communicable disease. Title 42 Code of Federal Regulations, §70.1(a-d), vol. 4, provides:
As used in this part, terms shall have the following meaning:
(a) Communicable diseases means illnesses due to infectious agents or their toxic products, which may be transmitted from a reservoir to a susceptible host either directly as from an infected person or animal or indirectly through the agency of an intermediate plant or animal host, vector, or the inanimate environment.
(b) Communicable period means the period or periods during which the etiologic agent may be transferred directly or indirectly from the body of the infected person or animal to the body of another.
(c) Conveyance means any land or air carrier, or any vessel as defined in paragraph (h) of this section.
(d) Incubation period means the period between the implanting of disease organisms in a susceptible person and the appearance of clinical manifestation of the disease.

[20] Title 63 O.S. 2011 §1-1925 provides in pertinent part:
The State Department of Health shall prescribe minimum standards for facilities. These standards shall regulate:
1. Location and construction of the facility, including plumbing, heating, lighting, ventilation, and other physical conditions which shall ensure the health, safety and comfort of residents and protection from fire hazards;
2. Number and qualifications of all personnel, including management and nursing personnel, having responsibility for any part of the care given to residents; specifically, the Department shall establish staffing ratios for facilities which shall specify the number of staff hours per resident of care that are needed for professional nursing care for various types of facilities or areas within facilities;
3. All sanitary conditions within the facility and its surroundings, including water supply, sewage disposal, food handling, and general hygiene, which shall ensure the health and comfort of residents;. . .
Title 63 O.S. 2011 §1-821 provides in pertinent part:
A. The State Board of Health shall promulgate rules to enforce the provisions of the Residential Care Act which shall include, but not be limited to, provisions for temperature settings, lighting, ventilation, and other physical conditions that affect the health, safety and welfare of the residents in a home. Residential care homes that provide care for three or fewer residents shall be subject to the provisions of the Residential Care Act; provided, however, if such rules unduly restrict operation of the home, the Board shall be authorized and shall promulgate additional rules for residential care homes based upon the number of residents in a home. . . .

[21] Title 59 O.S. 2011 §567.8 provides in pertinent part:
B. The Board shall impose a disciplinary action against the person pursuant to the provisions of subsection A of this section upon proof of one or more of the following items. The person: . . .
3. Fails to adequately care for patients or to conform to the minimum standards of acceptable nursing or Advanced Unlicensed Assistant practice that, in the opinion of the Board, unnecessarily exposes a patient or other person to risk of harm; . . .
Title 63 O.S. 2011 §1-825 provides:
Any person who violates any of the provisions of the Residential Care Act, the rules promulgated pursuant thereto by the State Board of Health, or any order or determination of the State Department of Health pursuant to the provisions of the Residential Care Act, or who fails to perform any duty imposed upon such person by the provisions of the Residential Care Act, shall be subject to any of the following penalties and liabilities as authorized by the provisions of the Residential Care Act:
1. License revocation, suspension, or nonrenewal;
2. Transfer of residents;
3. Temporary manager;
4. Injunctive proceedings;
5. Civil fines; and
6. Criminal penalties as provided in Section 1-832 of this title.

[22] Title 42 Code of Federal Regulations, §483, vol. 4, Part 483 Requirements for States and Long Term Care Facilities, Sec. 483.65 provides:
Infection control.
The facility must establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease and infection.
(a) Infection control program. The facility must establish an infection control program under which it--
(1) Investigates, controls, and prevents infections in the facility;
(2) Decides what procedures, such as isolation, should be applied to an individual resident; and
(3) Maintains a record of incidents and corrective actions related to infections.
(b) Preventing spread of infection.
(1) When the infection control program determines that a resident needs isolation to prevent the spread of infection, the facility must isolate the resident.
(2) The facility must prohibit employees with a communicable disease or infected skin lesions from direct contact with residents or their food, if direct contact will transmit the disease.
(3) The facility must require staff to wash their hands after each direct resident contact for which handwashing is indicated by accepted professional practice.
(c) Linens. Personnel must handle, store, process, and transport linens so as to prevent the spread of infection.
Title 45 Code of Federal Regulations §482.42 provides:
§482.42 Condition of participation: Infection control.
The hospital must provide a sanitary environment to avoid sources and transmission of infections and communicable diseases. There must be an active program for the prevention, control, and investigation of infections and communicable diseases.
(a) Standard: Organization and policies. A person or persons must be designated as infection control officer or officers to develop and implement policies governing control of infections and communicable diseases. The infection control officer or officers must develop a system for identifying, reporting, investigating, and controlling infections and communicable diseases of patients and personnel.
(b) Standard: Responsibilities of chief executive officer, medical staff, and director of nursing services. The chief executive officer, the medical staff, and the director of nursing services must--
(1) Ensure that the hospital-wide quality assessment and performance improvement (QAPI) program and training programs address problems identified by the infection control officer or officers; and
(2) Be responsible for the implementation of successful corrective action plans in affected problem areas.

[23] Title 42 Code of Federal Regulations, §483, vol. 4, (2008), Part 483 Requirements for States and Long Term Care Facilities, Sec. 483.25 provides in pertinent part:
. . .(n) Influenza and pneumococcal immunizations--
(1) Influenza. The facility must develop policies and procedures that ensure that--
(i) Before offering the influenza immunization, each resident or the resident's legal representative receives education regarding the benefits and potential side effects of the immunization;
(ii) Each resident is offered an influenza immunization October 1 through March 31 annually, unless the immunization is medically contraindicated or the resident has already been immunized during this time period;
(iii) The resident or the resident's legal representative has the opportunity to refuse immunization; and
(iv) The resident's medical record includes documentation that indicates, at a minimum, the following:
(A) That the resident or resident's legal representative was provided education regarding the benefits and potential side effects of influenza immunization; and
(B) That the resident either received the influenza immunization or did not receive the influenza immunization due to medical contraindications or refusal. . . .

[24] Title 42 Code of Federal Regulations, §483, vol. 4, (2008), Part 483 Requirements for States and Long Term Care Facilities, Sec. 483.75 provides in pertinent part:
A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.
(a) Licensure. A facility must be licensed under applicable State and local law.
(b) Compliance with Federal, State, and local laws and professional standards. The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility. . . .

[25] Title 63 O.S. 2011 §1-1102(a), (c) provides in pertinent part:
The following acts and the causing thereof within the State of Oklahoma are hereby prohibited:
(a) the manufacture, sale, or delivery, holding or offering for sale of any food that is adulterated or misbranded. . . .
(c) the receipt in commerce of any food that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.
Title 63 O.S. 2011 §1-1109(a)(4) provides:
A food shall be deemed to be adulterated:
(a) . .(4) if it has been produced, prepared, packed, or held under insanitary conditions whereby it may have been rendered diseased, unwholesome, or injurious to health; . . .

[26] Title 63 O.S. 2001 §§1-1102 and 1-1109, see note 25, supra.

[27] Oklahoma Department of Health Regulations §310: 675-17-1, see note 19, supra. See also, 63 O.S. 2011 §1-836, see note 17, supra; 42 Code of Federal Regulations, §70.1(a-d), vol. 4, see note 9, supra; 63 O.S. 2011 §1-1925 see note 10, supra; 63 O.S. 2011 §1-821 see note 10, supra; 42 C1ode of Federal Regulations, §483.65, see note 22, supra; 45 Code of Federal Regulations §482.42, see note 22, supra; 42 Code of Federal Regulations §483.25, see note 23, supra.

[28] Moore's job description was provided by the Nursing Center and it is found in the record at tab 33 attached as exhibit #2 to the Nursing Center's motion for summary judgment and brief. A charge nurse's duties state:
Duties
Responsibilities. . .
*Report all discrepancies noted concerning physicians orders, diet change, charting errors, etc, to the Director. . .
Nursing:. . .
*Check foods brought into facility and make sure they are appropriate/according to order and allowances. Reports any problems to the DON and Dietary Supervisor. . .
*Assist in infection control to ensure that tasks in which there is a potential exposure to blood/bodily fluids are properly identified. . . .
 


 


Winchester, J., with whom Taylor, J., joins, dissenting:
¶1 I respectfully dissent.
¶2 This employer did not require the employee to work his schedule nor remain at work and do other duties not associated with direct patient care. While I understand the summary judgment aspect, the majority nevertheless acknowledged that the termination of this employee was likely the result of actual misconduct. The majority opinion clearly impacts and restricts employment-at-will. I do not take issue with a health department rule that protects patient exposure. But, the employer should be given the flexibility to evaluate his employee's absence from work and also the flexibility to determine whether alternative duties are appropriate and consistent with the employment contract. The practical impact of this Court's holding is to expand the public policy exception to employment-at-will, which will now be governed by administrative rules and regulations. After this case becomes law, an employer must consult those rules and regulations before exercising the decision to terminate an employee.
¶3 The rule of stare decisis does not support the majority opinion. My reading of the opinion is that public policy is now also found in "Oklahoma and Federal regulations."[1] The majority opinion cites the at-will employment rule as established by stare decisis. In ¶ 18 of that opinion the Court quotes: "1) the plaintiff must identify an Oklahoma public policy goal that is clear and compelling and is articulated in existing Oklahoma constitutional, statutory or jurisprudential law. . . ." The majority opinion in ¶ 20 poses the "precise question of law" as "whether Oklahoma's constitutional, statutory, or decisional law or . . . a federal constitutional provision even prescribes a norm of conduct for Oklahoma that was violated." The opinion then answers "overwhelmingly and clearly yes."
¶4 The majority opinion cites Silver v. CPC-Sherwood Manor, Inc., 2004 OK 1, 84 P.3d 728, and pronounces a result not found in the Silver opinion: "In Silver . . . we recognized that a cook for a nursing home who was fired for going to the emergency room with diarrhea and throwing up stated a cause of action by showing a public policy violation of the Oklahoma Administrative Code provisions of the Oklahoma State Department of Health." Majority Opinion, ¶ 21. Emphasis added.
¶5 The majority opinion continues in the same paragraph that the public health codes "'in a clear and compelling fashion' articulate a well-defined, firmly established, state public policy prohibiting the holding, preparing, or delivering of food prepared under the conditions whereby it may have been rendered diseased, unwholesome, or injurious to health." That holding is not found in Silver.
¶6 An examination of that opinion reflects that the Silver majority attempted to continue to restrict "public policy" to statutes, as opposed to administrative regulations. The Silver Court does not cite Administrative Code provisions as setting public policy. In fact, it specifically disclaims such a position: "This Court need not mire itself in the controversy which confronted the Court of Civil Appeals concerning whether certain agency rules promulgated by the Oklahoma Department of Health provide a permissible source of public policy in this matter." Silver, 2004 OK 1, ¶ 6, 84 P.3d at 730.
¶7 The statutes cited in Silver were from title 63, and are now codified at 63 O.S.2011, §§ 1-1102, and 1-1109. The Silver Court held: " Sections 1-1102(a), (c) and 1-1109(a)(4) articulate, in a clear and compelling fashion, a well-defined, firmly established, state public policy prohibiting the holding, preparing, or delivering of food prepared under conditions whereby it may have been rendered diseased, unwholesome, or injurious to health." Silver, 2004 OK 1, ¶ 7, 84 P.3d at 730.
¶8 The new, and previously rejected rule, comes in ¶ 23 of the majority opinion of the case now before this Court: "Similar public health codes in a clear and compelling fashion, also articulate a well-defined, firmly established, state public policy prohibiting a nurse from working while infected with the influenza." The Court attempts its support of this new rule by linking article 5, § 39 of Oklahoma's Constitution, which vests legislative power to establish agencies, to the subsequent establishment of agencies. Then when administrative agencies promulgate rules, the majority opinion concludes that because administrative agencies create rules that are binding "similar to" statutes, and because those rules are authorized and approved by the Oklahoma Legislature, then these are somehow equivalent to statutory law. That reasoning is faulty.
¶9 Public policy cannot be delegated to an administrative agency. Section 1 of article IV of the Oklahoma Constitution provides:


"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."
¶10 Section 1 of article V of the Oklahoma Constitution requires that "The Legislative authority of the State shall be vested in a Legislature consisting of a Senate and House of Representatives. . . ." From these constitutional provisions comes the prohibition against the delegation of legislative power.
¶11 The Court in Democratic Party v. Estep, 1982 OK 106, ¶ 16, n. 23, 652 P.2d 271, 277 n. 23 (1982) observed that this prohibition against the delegation of legislative power "rests on the premise that the legislature must not abdicate its responsibility to resolve fundamental policy making by [1] delegating that function to others or [2] by failing to provide adequate directions for the implementation of its declared policy." Declaring that a violation of the Oklahoma Administrative Code provisions of the Oklahoma State Department of Health is a violation of public policy and therefore fits within the exception to at-will employment articulated in Burk v. K-Mart Corp., 1989 OK 22, ¶ 17, 770 P.2d 24, 28, is not supported by our case law.
¶12 "The terminable-at-will employment doctrine allows an employer to discharge an employee for good cause, no cause, or even for a morally wrong cause without being liable for a legal wrong." Reynolds v. Advance Alarms, Inc., 2009 OK 97, ¶ 5, 232 P.3d 907, 909. "The Burk tort does not even protect an employee from the employer's poor business judgment, or corporate foolishness. Shero v. Grand Savings Bank, 2007 OK 24, ¶ 12, 161 P.3d 298, 302. In Darrow v. Integris Health, Inc. 2008 OK 1, ¶ 13, 176 P.3d 1204, 1211, that Court held that even a federal statute by itself cannot serve as an articulation of Oklahoma public policy absent a specific Oklahoma court decision, statute or constitutional provision.
¶13 If administrative rules are added to the list of sources for finding a violation of a clear mandate of public policy, I do not see how a Burk tort can be described as a "tightly circumscribed framework." Shero, 2007 OK 24, ¶ 12, 161 P.3d at 303. Including administrative rules within the public policy exception greatly expands the Burk tort, placing a greater burden on employers who must search through those rules to determine whether termination of an employee will be against public policy. This new at-will employment rule forces employers to require that they terminate employees only if an articulable and provable good cause can be shown. The majority's holding continues to erode the right of employers to manage their businesses on a day-to-day basis.
¶14 I would affirm the summary judgment of the trial court.

FOOTNOTES

[1] Majority Opinion, ¶ 1 proclaims: "The public policy behind precluding a nursing home employee from working while infected with influenza is manifested in the Oklahoma Constitution, the Oklahoma statutes, Oklahoma and Federal regulations and caselaw." Emphasis added.
 
 
 
 
 
 




 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1989 OK 22, 770 P.2d 24, 60 OBJ 305, Burk v. K-Mart Corp.
Discussed at Length
 1992 OK 72, 833 P.2d 1218, 63 OBJ 1507, Tate v. Browning-Ferris, Inc.
Discussed
 1993 OK 117, 860 P.2d 230, 64 OBJ 2882, Brown v. Oklahoma State Bank & Trust Co. of Vinita
Discussed
 2001 OK 52, 29 P.3d 543, 72 OBJ 1933, CLINTON v. STATE ex. rel. LOGAN COUNTY ELECTION BD.
Discussed at Length
 2004 OK 1, 84 P.3d 728, SILVER v. CPC-SHERWOOD MANOR, INC.
Discussed at Length
 2007 OK 24, 161 P.3d 298, SHERO v. GRAND SAVINGS BANK
Discussed at Length
 2008 OK 1, 176 P.3d 1204, DARROW v. INTEGRIS HEALTH, INC.
Discussed
 2008 OK 21, 184 P.3d 518, ESTES v. CONOCOPHILLIPS CO.
Discussed at Length
 2008 OK 35, 186 P.3d 928, VASEK v. BOARD OF COUNTY COMMISSIONERS
Discussed
 2008 OK 105, 202 P.3d 144, KRUCHOWSKI v. THE WEYERHAEUSER CO.
Discussed
 2009 OK 97, 232 P.3d 907, REYNOLDS v. ADVANCE ALARMS, INC.
Discussed
 2014 OK 11, 321 P.3d 179, CITY OF JENKS v. STONE
Discussed
 1982 OK 106, 652 P.2d 271, Democratic Party of Oklahoma v. Estep
Discussed
Title 18. Corporations
 Cite
Name
Level

 18 O.S. 2037, Dissolution
Cited
 18 O.S. 2039, Winding Up of Business or Affairs - Binding Acts of Managers - Notice Presumed
Cited
Title 59. Professions and Occupations
 Cite
Name
Level

 59 O.S. 567.8, Denial, Revocation or Suspension of Licensure - Grounds - Charges, Investigations and Hearings - Reinstatement - Appeal
Discussed
Title 63. Public Health and Safety
 Cite
Name
Level

 63 O.S. 1-819, Short Title
Cited
 63 O.S. 1-821, Department Powers and Duties
Discussed
 63 O.S. 1-825, Penalties for Violations
Cited
 63 O.S. 1-836, Development of Minimum Standards for Homes - Certificate of Training
Discussed
 63 O.S. 1-1102, Acts Prohibited
Discussed at Length
 63 O.S. 1-1109, Adulterated Food
Cited
 63 O.S. 1-1901, Short Title
Cited
 63 O.S. 1-1925, Minimum Standards for Facilities
Discussed
 63 O.S. 1-1942, Rules and Regulations
Cited
Title 75. Statutes and Reports
 Cite
Name
Level

 75 O.S. 250.2, Powers of Legislature - Reserved Powers
Discussed
Title 85. Workers' Compensation
 Cite
Name
Level

 85 O.S. 1, Repealed by Laws 2011, SB 878, c. 318, § 87
Cited
Title 85A. Workers' Compensation
 Cite
Name
Level

 85A O.S. 1, Short Title
Cited