OSCN Found Document:HO v. TULSA SPINE & SPECIALTY HOSPITAL

 

 
 

 
 HO v. TULSA SPINE & SPECIALTY HOSPITAL
2021 OK 68
Case Number: 119752
Decided: 12/14/2021
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2021 OK 68, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

KRISTIE HO, Plaintiff/Appellant,
v.
TULSA SPINE & SPECIALTY HOSPITAL, L.L.C., a domestic limited liability company, Defendant/Appellee.
ON APPEAL FROM THE DISTRICT COURT FOR TULSA COUNTY
Honorable William Musseman, Trial Judge
Â¶0 The appellant, Kristi Ho, a nurse, sued her employer, the appellee, Tulsa Spine & Specialty Hosptial, L.L.C., alleging that the Hospital fired her because she would not come to work. She refused to go to work because of concern for her health and safety. She alleged the Hospital violated the Governor's directive to discontinue elective surgeries for a short time during a COVID-19 pandemic, and it did so without providing her proper personal protective equipment. The Hospital filed a motion to dismiss, arguing that the nurse was an employee-at-will, and that she failed to state a claim for wrongful discharge under Oklahoma law. The trial court agreed, and dismissed the lawsuit. The nurse appealed, and we retained the cause to address the first impression question of whether the Governor's temporary emergency COVID orders expressed public policy necessary to apply an exception to at-will employment which would support an action for wrongful discharge. We hold that because the Legislature expressly granted the Governor authority to issue temporary emergency orders, and the orders expressed the established public policy of curtailing an infectious disease, the exception to at-will employment as articulated by Burk v. K-Mart Corp. 1989 OK 22, Â¶17, 770 P.2d 24 and its progeny is applicable from March 24, 2020, until April 30, 2020. 
APPEAL PREVIOUSLY RETAINED;
TRIAL COURT REVERSED; CAUSE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
Jonathan E. Shook, Tulsa, Oklahoma, for Plaintiff/Appellant.
Jacob S. Crawford, W. Kirk Turner, Tulsa, Oklahoma, for Defendant/Appellee.
KAUGER, J.:
Â¶1 We retained this cause to address the first impression question of whether the Governor's temporary emergency COVID-19 orders expressed public policy necessary to apply an exception to at-will employment which would support an action for wrongful discharge. We hold that because the Legislature expressly authorized the Governor to issue temporary emergency orders, and the orders expressed established public policy of curtailing an infectious disease, the exception to at-will employment as articulated by Burk v. K-Mart Corp. 1989 OK, Â¶17, 770 P.2d 24, and its progeny is applicable from March 24, 2020, until April 30, 2020. 
ALLEGED FACTS
Â¶2 The defendant/appellee, Tulsa Spine & Specialty Hospital, L.L.C, (hospital/employer) hired the plaintiff/appellant, Kristie Ho (employee/nurse) in December of 2012. She insists that she was an exemplary at-will employee with positive performance reviews. On February 20, 2020, a little more than two months before she was terminated, the nurse's reviewing manager gave her a glowing "Excellent Performance" review. It identified her as an asset who was responsive, positive, respectful, accountable, dependable, a great mentor and teacher, with a strong work ethic.
Â¶3 On March 15, 2020, Oklahoma's Governor, J. Kevin Stitt, declared a state-wide emergency due to the coronavirus pandemic and the impending threat of the spread of COVID-19 to the people of this State and their peace, health, and safety.
[1] On March 24, 2020, the Governor, in a fourth amendment to his executive order, provided that medical providers in Oklahoma "shall postpone all elective surgeries, minor medical procedures, and non-emergency dental procedures until April 7, 2020."[2] 
Â¶4 Notwithstanding the Governor's order, the nurse contends that the hospital continued to perform elective surgeries, and that it did so without the availability and usage of personal protective equipment during pre-operative and post-operative care. On April 1, 2020, the Governor issued a seventh amended executive order extending the required postponement of all elective surgeries to April 30, 2020,[3] which resulted in a temporary, moratorium on elective surgeries. During the week of April 6, 2020, the hospital furloughed all the employees in the nurse's assigned outpatient pre-operative unit, with the exception of the nurse.

Â¶5 The nurse asserts that on April 10, 2020, the hospital performed elective surgeries and required the nurse to render services without adequate availability and usage of personal protective equipment. On April 12, 2020, the nurse contacted her manager, Nikki Gripe, to discuss her concerns about unsafe working conditions, and to report that a fellow employee who had tested positive for COVID-19 had been hospitalized. According to the nurse, she:
1) expressed her safety concerns and complained about having to work long hours on the 10th without adequate and appropriate personal protective equipment;
2) questioned why the hospital was doing elective surgeries in violation of the Governor's order;
3) requested to be furloughed like all of the other employees; and 4) informed her manager that she would not come to work on April 13 because of her safety concerns coupled with the ban on surgeries. 
The manager advised the nurse to contact the hospital's Human Resources Director, Natasha Hnizdo. She did. She repeated her concerns to the director, and the director told her if she did not return to work, her absence would be regarded as a resignation. The nurse contends she told her she was not resigning, but that she would not return to work until the ban on elective surgeries was lifted. The nurse sent her manager and the human resources manager various follow-up texts trying to determine what to do next.
Â¶6 The director sent the nurse a letter by certified mail on April 21, 2020, to her private mailbox at the UPS Store in the Tulsa Hills Shopping Center. The nurse, who was abiding by the City of Tulsa Mayor's Safer at Home executive order, did not pick up the letter. On April 27, 2020, the hospital terminated the nurse from employment.
Â¶7 On June 2, 2020, the nurse filed an action for wrongful discharge in the District Court of Tulsa County. She alleged that the employer terminated her in violation of the public policy of the State of Oklahoma because she declined to come to work without adequate and appropriate personal protective equipment or to provide nursing services for elective surgeries when, to do so, was a violation of the Governor's executive order banning such surgeries.
[4] 
Â¶8 The hospital filed a motion to dismiss on July 13, 2020, arguing that the nurse failed to state a claim for wrongful discharge under Oklahoma law. In an Amended Journal Entry of Judgment filed on July 20, 2021, the trial court granted the hospital's motion to dismiss. It determined that the nurse's wrongful termination claim, premised on a violation of the public policy of Oklahoma, does not exist. The nurse appealed, and the Court retained the appeal on August 4, 2021. The cause was assigned on August 26, 2021.

I.
BECAUSE THE LEGISLATURE EXPRESSLY AUTHORIZED THE GOVERNOR TO ISSUE TEMPORARY EMERGENCY ORDERS WHICH EXPRESSED THE ESTABLISHED PUBLIC POLICY OF CURTAILING
AN INFECTIOUS DISEASE THE EXCEPTION TO AT-WILL
EMPLOYMENT AS ARTICULATED BY Burk v. K-Mart Corp. 1989 OK 22, Â¶17, 770 P.2d 24 AND ITS PROGENY IS APPLICABLE FROM MARCH 24, 2020, UNTIL APRIL 30, 2020.
A. 
Standard of Review/Motion to Dismiss.
Â¶9 This cause was dismissed pursuant to a motion to dismiss. Consequently, the facts have not been determined and are mere allegations. An order dismissing a case for failure to state a claim upon which relief can be granted is subject to de novo review.[5] When reviewing a motion to dismiss, the Court must take as true all of the challenged pleading's allegations together with all reasonable inferences which may be drawn from them.[6] 
Â¶10 The purpose of a motion to dismiss is to test the law that governs the claim in litigation, not the underlying facts.[7] A pleading must not be dismissed for failure to state a legally cognizable claim unless the allegations indicate beyond any doubt that the litigant can prove no set of facts which would entitle the plaintiff to relief.[8] 

B.
Employment-at-Will and the Public Policy Exception.
Â¶11 This Court has long recognized the basic principle that an employment contract of indefinite duration may be terminated without cause at any time without incurring liability for breach of contract.
[9] Such indefinite employment contracts are deemed terminable-at-will a/k/a employment-at-will. The classic statement of the at-will rule is that an employer may discharge an employee for good cause, for no cause or even for cause morally wrong, without being guilty of a legal wrong.[10] 
Â¶12 Principles of freedom of contract and the importance of economic growth are attributed to the development of the terminable-at-will doctrine.[11] Nevertheless, this Court has observed the terminable-at-will doctrine is not absolute. The Oklahoma Legislature, not unlike Congress and other state legislatures, has enacted various statutory exceptions to the doctrine to accommodate the competing interests of the employee and employer. Similarly the courts have created exceptions to the employment-at-will rule.[12] 
Â¶13 The nurse argues that because the Governor's emergency orders were an expression of Oklahoma public policy, they must also support an exception to at-will employment as articulated by Burk v. K-Mart Corp, 1989 OK 22, Â¶17, 770 P.2d 24. The hospital argues that the orders are not the well-defined, firmly established state public policy required to support such a tort claim. We agree with the nurse.

Â¶14 Burk involved a federal certified question concerning an alleged "implied obligation of good faith and fair dealing" in reference to termination of any employment-at-will contract. The Burk employee sued her employer in contract and in tort, alleging that she was prevented from performing her job duties and was, consequently, constructively discharged. She also further asserted that her employer's agent told her he would not recommend her for a promotion because of her sex.
Â¶15 Although the Court rejected the implication of a duty of good faith and fair dealing in every employment-at-will contract, Burk was the landmark case wherein the Court adopted a public policy exception to the at-will termination rule. It confined the exception to a narrow class of cases in which the discharge of an employee is contrary to the clear mandate of public policy as articulated by constitutional, statutory, or decisional law. We recognized, for the first time, that the action was a tort. We also noted that because the term "public policy" was vague, the exception had to be tightly circumscribed.
Â¶16 Three years after Burk, supra, we promulgated Tate v. Browning Ferris, Inc, 1992 OK 72, 833 P.2d 1218. Tate involved the question of whether a Burk tort could be asserted for racial discrimination, to which we answered -- yes.[13] In Clinton v. State of Oklahoma ex rel. Logan County Election Board, 2001 OK 52, Â¶10, 29 P.3d 543, the Court also clarified the parameters of the Burk tort remedy, noting that:
1) the plaintiff must identify an Oklahoma public policy goal that is clear and compelling and is articulated in existing Oklahoma constitutional, statutory or jurisprudential law; 
2) the existence of a federal statutory remedy or state statutory remedy which is sufficient to protect the identified Oklahoma public policy goal precludes a Burk tort; 
3) the plaintiff must establish he or she is an at-will employee and the reason for discharge violates the identified Oklahoma public policy goal;
4) a discharge for purposes of the Burk tort may be either actual or constructive. 
Â¶17 We again addressed the elements of a Burk tort in Vasek v. Board of County Commissioners, 2008 OK 35, Â¶Â¶27-28, 186 P.3d 928. It involved a plaintiff who alleged wrongful termination for making a complaint to the Department of Labor (DOL) concerning mold at the courthouse. The plaintiff's action was based on the fact that she alleged she was fired for reporting her employer's violation of the law. We reiterated the elements of a Burk tort in such circumstances, stating:
The elements of a claim for wrongful discharge of an at-will employee articulated in Burk and its progeny can be summarized. A viable Burk claim must allege (1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal. (Emphasis supplied.) 
Accordingly, the question here is whether Oklahoma's constitutional, statutory, or decisional law or federal constitutional provision prescribes a norm of conduct for Oklahoma in which no statutory remedy exists to adequately protect the Oklahoma policy goal. 
C. 
The Legislature Expressly Authorized the Governor to Issue Temporary Emergency Orders, and the Orders Expressed Established Public Policy of Curtailing Infectious Disease.
Â¶18 In Treat v. Stitt, 2020 OK 64, Â¶Â¶4-5, 473 P.3d 43 we explained that the legislative branch sets the public policy of the State of Oklahoma by enacting law which does not conflict with the Oklahoma Constitution. The Governor has a role in setting that public policy through his function to execute the law. However, the Governor only has the power and authority which is specifically granted by the Legislature through statutory law, or power conferred upon the Chief Executive by the Constitution.[14] The Okla. Const. art. 6, Â§8 provides:
The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States, and he shall be a conservator of the peace throughout the State. 
Â¶19 As far as the Governor's general authority goes, it is recognized that the drafters of the Oklahoma Constitution placed provisions to protect the people of the State of Oklahoma against excessive political and economic power.
[15] Oklahoma's historical underpinnings were extremely economically conservative.[16] Fearing excessive power in the hands of one individual, the framers of the Oklahoma Constitution intentionally created a weak state chief executive.[17] The Governor's authority is limited by the Constitution, because the Chief Executive may exercise only the power specifically granted by it or by the Legislature.[18] 
Â¶20 The Governor is without authority to exercise a discretion not validly and specifically granted by the statutory law and not within the power conferred upon the Chief Executive by the Constitution.[19] The Legislature is free to repeal any authority that it has granted. Even though the COVID crisis was a novel emergency crisis, the likes of which had not been seen for over a hundred years, the Governor's authority to issue emergency executive orders relating to such an emergency was expressly delegated by the Legislature. It is well grounded in Oklahoma's statutory authority. Title 63 O.S. 2011 Â§6403 provides in pertinent part:

. . . B. During a state of catastrophic health emergency, the Governor may:
1. Suspend the provisions of any regulatory statute prescribing procedures, for conducting state business, or the orders and rules of any state agency, to the extent that strict compliance with the same would prevent, hinder, or delay necessary action (including emergency purchases) by the public health authority to respond to the catastrophic health emergency, or increase the health threat to the population; 
2. Utilize all available resources of the state government and its political subdivisions, as reasonably necessary to respond to the catastrophic health emergency;
3. Transfer the direction, personnel, or functions of state departments and agencies in order to perform or facilitate response and recovery programs regarding the catastrophic health emergency;
4. Mobilize all or any part of the National Guard into service of the state. . . .
5. Provide aid to and seek aid from other states during the catastrophic health emergency in accordance with any interstate emergency compact made with this state; and

6. Seek aid from the federal government . . . 
Â¶21 Title 63 O.S. 2011 Â§683.1, the Oklahoma Emergency Management Act of 2003. Section 683.2 of the Act provides in pertinent part:
A. Because of the existing and increasing possibility of the occurrence of disasters of unprecedented size and destructiveness resulting from natural and man-made causes, in order to ensure that preparations of this state will adequately deal with such disasters and emergencies, to generally provide for the common defense and to protect the public peace, health, and safety, to preserve the lives and property of the people of this state, and to carry out the objectives of state and national survival and recovery in the event of a disaster or emergency, it is hereby found and declared to be necessary to: . . .
4. Confer upon the Governor and upon the executive heads or governing bodies of the political subdivisions of the state the emergency powers provided by the Oklahoma Emergency Management Act of 2003; . . .
Title 63 O.S. 2011 Â§683.9 provides in pertinent part:
The provisions of this section shall be operative only during the existence of a natural or man-made emergency. The existence of such emergency may be proclaimed by the Governor or by concurrent resolution of the Legislature if the Governor in such proclamation, or the Legislature in such resolution, finds that an emergency or disaster has occurred or is anticipated in the immediate future. Any such emergency, whether proclaimed by the Governor or by the Legislature, shall terminate upon the proclamation of the termination thereof by the Governor, or by passage by the Legislature of a concurrent resolution terminating such emergency. During such period as such state of emergency exists or continues, the Governor shall have and may exercise the following additional emergency powers: . . .
[20] 
Â¶22 Likewise, the necessity of curtailing the spread of such a contagious virus is also well grounded and authorized by Oklahoma's statutory authority.
[21] So much so that nurses may lose their license for neglecting to do their part in curtailing the spread of infectious disease.[22] Even though they are by their nature temporary and of limited duration, emergency orders are designed to address the immediate public policy health crisis at hand. [23] Moore v. Warr Acres Nursing Center, 2016 OK 28, 376 P.2d 894 and Silver v. CPC-Sherwood Manor, Inc. 2004 OK 1, 84 P.3d, 728, involved nurses who were fired for not coming to work while they had contagious infections. In both causes, we reviewed the public policy exceptions which support a Burk, supra, tort. In Moore, supra, we explained that the precise question of law was not the employee's sufficiency of remedies, but rather whether Oklahoma's constitutional, statutory, decisional law, or a federal constitutional provision even prescribes a norm of conduct for Oklahoma that was violated. The answer was clearly yes. 
Â¶23 In both Moore, supra, and Silver, supra, we explained:
1. health codes disseminated by the boards of health, as directed by the Legislature, are clear and compelling, articulated, well-defined, firmly established expressions of public policy which satisfy the public policy exception to at-will employment; 
2. health care facilities are required to have infection control policies to provide a safe and sanitary environment to ensure the health of its patients; 
3. The Okla. Const. art. 5 Â§39 directs the legislature to create the Board of Health, and art. 5 vests the Legislature the power to establish agencies such as the Oklahoma Health Department and to designate agency functions. The Legislature delegates rule making authority to facilitate administration of legislative policy and such delegation is intended to eliminate the necessity of establishing every administrative aspect of general public policy by legislation. Administrative agencies create rules which are binding similar to a statute and are only created within legislatively-granted authority and approval. Such rules are necessary in order to make a statutory scheme fully operative. Public health codes "in a clear and compelling fashion," articulate a well-defined, firmly established, state public policy . . .
[24] 
Â¶24 In a similar manner in which the Oklahoma Department of Health Regulations Â§310:675-7-17-1, were statutorily mandated to implement the Nursing Home Care Act, control infections, and provide a safe and sanitary environment, the Governor's temporary orders were Legislatively mandated in a health crisis. They were designed to control infections, and provide a safe and sanitary environment for Oklahomans. 
Â¶25 The critical purpose of the temporary emergency orders was to protect the public, patients, and hospital staffs, and to reduce the chances of contracting and spreading the unprecedented contagious disease. The ban on elective surgeries was only in effect for March 24, 2020 to April 30, 2020. At the time that the Governor issued the emergency orders, he did so within the full authority statutorily granted by the Legislature pursuant to 63 O.S. 2011 Â§6403, and Â§Â§683.1 and 683.9. The orders were limited to the time of a catastrophic health emergency. The orders expressed the public policy of the State of Oklahoma for the period the orders were effective, pursuant to the exception of Burk v. K-Mart Corp., 1989 OK, Â¶17, 770 P.2d 24, and its progeny.
Â¶26 Although the orders were short-lived, they expressed public policy at the time. Accordingly, we hold that because the Legislature expressly granted the Governor authority to issue temporary emergency orders, and the orders expressed established public policy of curtailing an infectious disease, the exception to at-will employment as articulated by Burk v. K-Mart Corp. 1989 OK 22, Â¶17, 770 P.2d 24 and its progeny is applicable in this cause from March 24, 2020, until April 30, 2020.
CONCLUSION
Â¶27 When reviewing a motion to dismiss, the Court must take as true all of the challenged pleading's allegations together with all reasonable inferences which may be drawn from them.
[25] The purpose of a motion to dismiss is to test the law that governs the claim in litigation, not the underlying facts.[26] The doctrine of at-will employment is not in jeopardy or threatened under the facts alleged by the nurse. The employee could have been legally terminated by the employer for any reason which did not violate public policy ---- and those exceptions are extremely rare.
Â¶28 However, there are operative facts left to be determined. Here, the hospital denies that it was providing elective surgeries, or inadequate equipment to provide a healthy and safe work environment under the conditions which existed at the time. We express no opinion concerning the hospital's possible liability in this cause. The hospital disputes whether the nurse's firings had anything to do with her allegations. The facts regarding what equipment was provided, whether equipment was available, what surgeries were performed, what surgeries were elective, what is an elective surgery, and what the nurse might have been exposed to, have not yet been fully presented because of the dismissal for failure to state a claim.
Â¶29 Reducing the spread of infectious, contagious, and potentially deadly diseases has always been a priority and concern of the State of Oklahoma, and Federal government regardless of the novelty of the disease. Pursuant to 63 O.S. 2011 Â§6403, and Â§Â§683.1 and 683.9, the Oklahoma Legislature expressly authorized the Governor to issue temporary health orders during a catastrophic outbreak. He did so, and the orders which were only effective from March 24, 2020, to April 30, 2020. We express no opinion on the likelihood of a successful outcome for the nurse. Our jurisprudence requires that in a motion to dismiss her allegations must be taken as true and the reasonable inferences drawn from them. A motion to dismiss tests the law, not the facts. Accordingly, dismissal was premature. The cause is reversed and remanded for proceedings consistent with this opinion. 
APPEAL PREVIOUSLY RETAINED;
TRIAL COURT REVERSED; CAUSE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
KAUGER, EDMONDSON, COMBS, GURICH, KUEHN (by separate writing), JJ., concur.
DARBY, C.J., KANE, V.C.J. (by separate writing), WINCHESTER (by separate writing), ROWE (by separate writing), JJ., dissent.
FOOTNOTES
[1] The Governor's Executive Order 2020-07, filed with the Oklahoma Secretary of State on March 15, 2020, states in pertinent part:

Therefore, I, J. Kevin Stitt, Governor of the State of Oklahoma, pursuant to the power vested in me by Section 2 of Article VI of the Oklahoma Constitution, hereby declare and order the following:
1. There is hereby declared an emergency caused by the impending threat of COVID-19 to the people of this State and the public's peace, health, and safety. The counties included in this declaration are:
All 77 Oklahoma Counties

2. The State Emergency Operations Plan has been activated, and resources of all State departments and agencies available to meet this emergency are hereby committed to the reasonable extent necessary to prepare for and respond to COVID-19 and to protect the health and safety of the public. . . (Emphasis in original.)
[2] The Governor's Fourth Amended Executive Order filed on March 24, 2020, provides in pertinent part:

. . .18. Oklahomans and medical providers in Oklahoma shall postpone all elective surgeries, minor medical procedures, and non-emergency dental procedures until April 7, 2020. . . . 
[3] The Governor's Seventh Amended Executive Order filed on April 1, 2020, provides in pertinent part:

. . .18. Oklahomans and medical providers in Oklahoma shall postpone all elective surgeries, minor medical procedures, and non-emergency dental procedures until April 7, 30, 2020. . . .
The next day, on April 2, 2020, noting the high potential public health threat posed by COVID-19, the Governor again declared that "a health emergency exists in the State of Oklahoma." The order was in effect for thirty (30) days from April 1, 2020, but it did not specifically address surgeries, elective or otherwise. 
[4] The nurse also relies on 40 O.S. 2011 Â§Â§401 et seq., the Oklahoma Occupational Health and Safety Standards Act (the Act), in support of her allegations. In Griffin v. Mullinix, 1997 OK 120, Â¶17, 947 P.2d 177, this Court held that no Oklahoma articulation of public policy exists with regard to the private employer under the Act. This holding was in part due to an amendment in the Act which removed private employers from the definition of employer under the Act. Griffin, supra, has not been expressly overruled.
[5] Tuffy's Inc. v. City of Oklahoma City, 2009 OK 4, Â¶6, 212 P.3d 1158.
[6] Tuffy's Inc. v. City of Oklahoma City, see note 5, supra.
[7] Tuffy's Inc. v. City of Oklahoma City, see note 5, supra.
[8] Tuffy's Inc. v. City of Oklahoma City, see note 5, supra.
[9] Burk v. K-Mart Corp, 1989 OK 22, Â¶5, 770 P.2d 24; Hinson v. Cameron, 1987 OK 49, 742 P.2d 549, Â¶9, fn. 6; Singh v. Cities Service Oil Co., 1976 OK 123, Â¶Â¶5-6; 554 P.2d 1367; Foster v. Atlas Life Ins. Co. 1931 OK 617, Â¶0, 6 P.2d 805.
[10] Burk v. K-Mart Corp,, see note 9, supra.
[11] Burk v. K-Mart Corp,, see note 9, supra.
[12] Burk v. K-Mart Corp,, Â¶6 see note 9, supra.
[13] The history and evolution of the Burk tort is detailed in our opinion in Kruchowski v. Weyerhaeuser Company, 2008 OK 105, 202 P.3d 144.
[14] See, Compsource Mutual Ins. Co. v. State ex rel. Oklahoma Tax Comm'n, 2018 OK 54, Â¶43, 435 P.3d 90; Wells v. Childers, 1945 OK 365, 165 P.2d 371.
[15] Strickland, Renard J., and Thomas, James C., Most Sensibly Conservative and Safety Radical: Oklahoma's Constitution Regulation of Economic Power, Land Ownership and Corporate Monopoly, 9 Tulsa L. J. 167 (2013).
[16] Renard J. Strickland, and James C. Thomas, Most Sensibly Conservative and Safety Radical: Oklahoma's Constitution Regulation of Economic Power, Land Ownership and Corporate Monopoly, 9 Tulsa L.J. 167 ( 2013) .
[17] Jean Shurmway Warner, Oklahoma Governors, The Almanac of Oklahoma Politics, pg. 10
[18] Johnson v. Walters, 1991 OK 207, Â¶5-7, fn. 10-13, Kauger, J., concurring 819 P.2d 694.
[19] See, Compsource Mutual Ins. Co. v. State ex rel. Oklahoma Tax Comm'n, note 14, supra; Wells v. Childers, note 14, supra.
[20] See, also, Attorney General Opinion, 2001 OK AG 44, Â¶16 regarding the Governor's responsibility to carry out the provisions of the Act and the Governor's broad authority under the Act. 
[21] Title 63 O.S. 2011 Â§1-713 provides in pertinent part:
The State Commissioner of Health, in making the survey and inventory of existing hospitals, health centers, community mental health facilities, and related health facilities, and in developing programs for the construction of public and other nonprofit health facilities, shall carry out such purposes in accordance with standards prescribed by the Surgeon General of the United States Public Health Service with the approval of the Federal Hospital Advisory Council. The Commissioner shall make such reports, in such form and containing such information, as the Surgeon General of the United States Public Health Service may from time to time require. . .
The State of Oklahoma, through the Oklahoma State Department of Health, helps combat patient care and the control of infectious diseases in hospitals. Title 310, Â§667-13-1, of the Department's Health Code sets standards in hospital for the control of infectious diseases. It provides:
Each hospital shall establish an infection control program to provide a sanitary environment and avoid sources and transmission of infections. The program shall include written policies and procedures for identifying, reporting, evaluating and maintaining records of infections among patients and personnel, for ongoing review and evaluation of all aseptic, isolation and sanitation techniques employed in the hospital, and development and coordination of training programs in infection control for all hospital personnel.
Among the procedures are included, Â§667-13-4 which provides:
The policies and procedures outlined by the infection control program shall be approved by the infection control committee and contain at least the following:
(1) A requirement that a record of all reported infections generated by surveillance activities include the identification and location of the patient, the date of admission, onset of infection, the type of infection, the cultures taken, the results when known, any antibiotics administered and the physicians and practitioners responsible for care of the patient.
(2) Specific policies related to the handling and disposal of biomedical waste.
(3) Specific policies and procedures related to admixture and drug reconstitution, and to the manufacture of intravenous and irrigating fluids.
(4) Specific policies regarding the indications for and types of isolation to be used for each infectious disease. These policies shall incorporate the concepts of Standard Precautions and utilize the recommended transmission-based categories of Contact, Airborne, and Droplet isolation procedures where deemed appropriate by the medical staff.
(5) A definition of nosocomial infection.
(6) Designation of an infection control officer, who coordinates the infection control program.
(7) A program of orientation of new employees and other workers, including physicians, and a program of continuing education for previously employed personnel concerning infection control. Written documentation shall be maintained indicating new employees have completed the program and that previously employed have attended continuing education.
State statutes and health regulations include 63 O.S. 2011 Â§Â§1-1900.1 et seq (the Nursing Care Act; 63 O.S. 2011 Â§Â§ 1-819 et seq. (The Residential Care Act); Infection Control Regulations from the Department of Health, 310:675-7-17.1 as well as federal regulations 42 CFR Ch. V., Pt. 483, Â§483 (Infection Control) and Â§483.65, Â§483.75, and Oklahoma Regulations, 9 OK Reg 3163, 10 OK Reg 1639, 24 OK Reg. 2030, 25 OK Reg. 2382.
[22] Nurses license are tied to controlling infections. See, Title 59 O.S. 2011 Â§567.8 provides in pertinent part:
B. The Board shall impose a disciplinary action against the person pursuant to the provisions of subsection A of this section upon proof that the person: . . . 
3. Fails to adequately care for patients or to conform to the minimum standards of acceptable nursing or Advanced Unlicensed Assistant practice that, in the opinion of the Board, unnecessarily exposes a patient or other person to risk of harm; . . .
[23] Other Courts, in unpublished opinions, have determined that executive orders do not support a wrongful termination claim. See, e.g., Amato v. Division of Information Technology, 2010 WL 2035538 [Narrow grounds to expand wrongful termination on public policy grounds have only involved pronouncements of the legislature, and there was no basis to extend executive order which applied only to employees of executive branch.].
[24] Similar public health codes, in a clear and compelling fashion, also articulate a well-defined, firmly established, state public policy prohibiting a nurse from working while infected with the influenza. In Estes v. Conoco Phillips Co., 2008 OK 21, Â¶10, 184 P.3d 518 we recognized that: 1) pursuant to the Administrative Procedures Act, 75 O.S. 2011 Â§Â§250-323, the Legislature may delegate rulemaking authority to agencies, boards, and commissions to facilitate the administration of legislative policy; and 2) Administrative rules are valid expressions of lawmaking powers having the force and effect of law.
[25] Tuffy's Inc. v. City of Oklahoma City, see note 5, supra.
[26] Tuffy's Inc. v. City of Oklahoma City, see note 5, supra.

KUEHN, J., with whom Kauger, Combs and Gurich, JJ., join, Specially Concurring:
Â¶1 I agree with the Majority opinion and write separately to emphasize its narrow scope. The opinion answers two questions of law: can an executive order ever provide the basis for a public policy exception to at-will employment, and does the particular executive order at issue here do so? Having answered "yes" to both, the majority finds that Plaintiff/Appellant has stated a claim that can survive a motion to dismiss. It is important to stress what the opinion does not do: decide the merits of that claim. As this is an appeal from a Motion to Dismiss, this Court cannot tell any party what surgeries would be considered elective under the order. It cannot, and does not, because there has been no evidence on that -- or, indeed, any other -- issue. This Court cannot predict what will happen when this claim is litigated in the trial court. Perhaps the parties will present evidence defining what the Governor intended to be elective surgery subject to the executive order; if so, the surgery at issue here may or may not fit within it. Perhaps the hospital will present evidence that no surgeries at all were performed during the relevant time period. Whether a particular set of facts falls within a public policy has no bearing on whether the public policy exists and is clearly expressed.
Â¶2 This Court adopted a narrow public policy exception to the termination of employment at will in Burk v. K-Mart Corp., 1989 OK 22, Â¶ 17, 770 P.2d 24, 28. This protects employees from being fired either for "refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." Id., Â¶ 19, 770 P.2d at 29. Following other state and federal courts, we described the exception as "a clear mandate of public policy as articulated by constitutional, statutory or decisional law." Id., Â¶ 17, 770 P.2d at 28. Like other courts, generally speaking, this Court looks to the legislature and the judiciary to determine public policy. The legislature enacts statutes, and the judiciary may in rare circumstances adopt policy through case law. As an example, the Burk public policy exception itself was created by this Court; if the dissenters are consistently concerned about uncertainties inherent for both employers and employees in determining whether a public policy exception exists, they should overrule Burk.
Â¶3 However, as the Majority explains, the Legislature has authorized the Governor to issue executive orders under extraordinary circumstances.[1] This power is delegated, and strictly circumscribed by statute. While the Governor may both declare and terminate an emergency, the Legislature has the authority to determine that an emergency has ended -- and any executive orders issued in response to it will end as well -- independently of the Governor. While these orders are necessarily designed to address an immediate crisis or emergency, they may also clearly express public policy. In fact, in time of emergency, the Legislature has specifically decided that the Governor is in charge. Under those circumstances, the Governor may be the only person capable of expressing that particular public policy. Neither the Legislature nor the judiciary may have that capability, particularly in the compressed time frame emergencies so often create. 
Â¶4 The Majority neither expands the public policy exception nor erodes the employment-at-will doctrine. Rather, the Majority rightly recognizes that, under narrow circumstances, the Legislature allows the Governor to issue emergency orders which may include an expression of public policy. Unlike a typical executive order, these emergency orders are established through statute. For this reason, they may contain an expression of public policy that is clear and well-established enough to fall within the Burk exception. Burk neither mentioned executive orders nor found that they differ fundamentally from judicial opinions or legislative action. Instead, following the Supreme Court of Hawaii, Burk rightly concluded that, without a legislative or judicial precedent, courts should "proceed cautiously" before declaring the presence of a public policy. Burk, Â¶ 18, 770 P.2d at 29. That is what this Court has done. There was no executive order at issue in Burk, and the omission of executive orders from the Burk list was understandable. But now that the issue is squarely presented, the Majority repairs the omission, and includes executive orders established through the emergency powers statute in the list of things which may support the public policy exception to the at-will rule. Rather than expanding the exception, the Majority conservatively interprets both the letter and the spirit of the rule.
Â¶6 One dissenter suggests that other jurisdictions have declined to include executive orders in the public policy exception. All the cases considering executive orders addressing COVID-19 are necessarily recent, and most were decided at the district court level. The dissenter primarily relies on cases from United States District Courts interpreting state law. Those federal courts did not allow the exception because, like Oklahoma, the relevant state courts had not previously included executive orders in the exception. Since a federal court has no power to change a state judicially-created law, these courts' decisions not to do so are neither relevant nor persuasive. Similarly, a Connecticut trial court refused to include executive orders in the exception where the Connecticut appellate court had not yet had the opportunity to do so. The only pre-COVID case the dissent cites is an unpublished opinion from an intermediate Massachusetts appellate court; that brief memorandum opinion merely notes that, as the Massachusetts Supreme Judicial Court had not yet included executive orders in the exception, the intermediate court would not either. None of this supports a conclusion that any relevant state court -- particularly a court of last resort -- has specifically declined to include executive orders in the public policy exception, particularly under emergency circumstances.
Â¶7 When the Governor issues an emergency executive order, it will end when the emergency ends, if not before. It is finite. It has a temporal limit. This characteristic appears to have created some confusion. Respondents argue that an executive order is too transitory, or temporary, to be "clearly established". I disagree. Whether a legal action -- statute, judicial opinion, or executive order -- might end at a certain time has nothing to do with whether it is clearly established, or whether it legitimately expresses public policy. Every expression of public policy is established at the moment it is enacted. Each November 1, newly-enacted laws go into effect; those are as well established at that time as ones that have been in effect for decades. When this Court, or any court of last resort, issues an opinion affecting an issue of public policy, it is established at the moment it is final.
Â¶8 And every expression of public policy can potentially end at any time. Cases can be overturned or superceded by statute. Statutes can be amended or repealed. In 1997, the Legislature passed the Omnibus Crime Bill Truth in Sentencing Act, which contained clear expressions of public policy about criminal justice reform. By 1999, almost the entire Act had been repealed. Yet, there is no doubt that the expression of public policy was both legitimate and clearly established.
Â¶9 Not every executive order will express public policy. I agree with the Majority that the emergency order at issue here does. It is argued that the executive order's expression of public policy was overly broad because it did not contain specific definitions. However, federal healthcare guidelines and recommendations provided context and guidance for those seeking to implement the order. This particular emergency, the rapid spread of COVID-19, had an effect on public health, health care resources, and the economic well-being of our state and everyone in it. And, at the time this particular executive order was promulgated, it was designed to address the COVID-19 crisis and protect the citizens of the State by taking measures to curtail what was then a rapidly spreading, often fatal, highly infectious disease for which there was no cure and little effective treatment. The decision of whether any given surgery falls within the order is left initially to the trial court. But I believe the public policy underlying this executive order was clearly established.
FOOTNOTES
[1] While this authorization may be an overarching expression of public policy, referring to executive powers, it is not the expression of public policy which concerns us in this case.

KANE, V.C.J., dissenting:
Â¶1 The Majority's opinion expands the reach of Burk v. K-Mart Corp., 1989 OK 22, 770 P.2d 24, by construing a legislative grant of authority to the Governor to be some type of enactment of constitutional, statutory, or jurisprudential law -- it is not. For this reason, I respectfully dissent.

Winchester, J., with whom Darby, C.J. joins, dissenting:
Â¶1 Could a cancer patient obtain surgery during the time that Governor Stitt's emergency executive order regarding elective surgeries was in place? Or could a woman obtain pre-natal surgery? My complaint with the majority is that it cannot tell a hospital, doctor, or patient which surgeries or procedures were elective during the time that the executive order was in place. Common sense tells us that the hospital, doctor, and patient balanced the risks and benefits to determine whether to delay a surgery. The majority's holding shifts the authority to the nurse--the employee--to decide whether she went to work thereby impacting the ability of the hospital and doctor to give necessary care to the patient; the decision to receive care during this time should have been between the doctor and patient. Consequently, the majority's decision further erodes Oklahoma's employment-at-will doctrine. I do not question the Legislature's delegation of authority to Governor Stitt to make emergency executive orders. However, that authority alone does make an executive order clear and compelling public policy. Governor Stitt's transitory emergency Executive Order 2020-07, relied upon by the majority and Appellant Kristie Ho (Nurse), is not the "clearly established public policy" necessary to apply the exception to at-will employment articulated by Burk v. K-Mart Corp., 1989 OK 22, Â¶ 17, 770 P.2d 24, 28.
Â¶2 Employment in Oklahoma is typically at-will, which allows an employer to discharge an employee for a good cause, no cause, or even for a morally wrong cause without being liable for a legal wrong. Reynolds v. Advance Alarms, Inc., 2009 OK 97, Â¶ 5, 232 P.3d 907, 909. Our Court has recognized a very limited public policy exception to the employment-at-will doctrine. That exception can be triggered when a plaintiff alleging a Burk tort identifies a well-defined, clear, and compelling Oklahoma public policy that is "articulated by constitution, statutory or decisional law." Burk, 1989 OK 22, Â¶ 17, 770 P.2d at 28. This exception applies to only a narrow class of cases and must be tightly circumscribed. Id. Â¶ 18, 770 P.2d at 28-9. In reaching Burk's conclusion, the Court relied on a case from the Supreme Court of Hawaii that held "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." Id. (citing Parnar v. Americana Hotels, Inc., 652 P.2d 625, 631 (Haw. 1982)). The types of clear and compelling public policy exceptions recognized by this Court that bar termination are gender discrimination, racial discrimination, age discrimination, retaliation for reporting crimes, and prohibition from working while infected with a communicable disease. See, e.g., Moore v. War Acres Nursing Home, 2016 OK 28, 376 P.3d 894; Vasek v. Bd. of Cty. Comm'rs, 2008 OK 35, 186 P.3d 928; Darrow v. Integris Health Inc., 2008 OK 1, 176 P.3d 1204; Silver v. CPC-Sherwood Manor, Inc., 2004 OK 1, 84 P.3d 728; Tate v. Browning Ferris, Inc., 1992 OK 72, 833 P.2d 1218; Burk, 1989 OK 22, 770 P.2d 24. 
Â¶3 Here, Nurse alleges the hospital's termination of her employment was contrary to Oklahoma's public policy set forth in the emergency Executive Order 2020-07, which stated that medical providers shall postpone all "elective surgeries." Nurse's claim does not fall within this Court's precedent of the narrow class of complaints in which the discharge maybe be characterized as contrary to a clear and compelling mandate of public policy, and Nurse may not rely on Governor Stitt's Executive Order 2020-07 as a source of public policy to support her Burk claim.
Â¶4 Several other jurisdictions have declined to extend the public policy claims to executive orders, finding similarly that a public policy exception must be based on a well-established public policy articulated in the state's constitution, judicial precedent, or statutes. See Hermes v. Okla. Arthritis Ctr., P.C., No. CIV-20-871-SLP, 2021 WL 3540322, at *5-6 (W.D. Okla. June 8, 2021) (holding Oklahoma public policy supporting Burk claim may not be found in a COVID-19 executive order); Valdivia v. Paducah Ctr. for Health & Rehab., LLC, No. 5:20-CV-0087-TBR, 2020 WL 7364986, at *5-7 (W.D. Ky. Dec. 15, 2020) (dismissing a wrongful termination claim reasoning that governor's COVID-19 executive orders were not proper sources of public policy); Taney v. Gaylor, No. DBDCV200637141S, 2021 WL 4295814, at *3 (Conn. Super. Ct. Aug. 30, 2021) (dismissing claim for wrongful termination based on the governor's COVID-19 emergency executive order); Amato v. Div. of Info. Tech., No. 09-P-1413, 2010 WL 2035538, at *1 (Mass. App. Ct. 2010) (holding there is no basis in law to extend public policy exception to an executive order).
Â¶5 The Burk Court recognized that judicial opinions and legislative enactments are fundamentally different than emergency executive orders. Burk, Â¶ 18, 770 P.2d at 28-9. This is the case even where those executive orders rely on emergency authority from the Legislature. One court explained that an emergency executive order "is usually temporary, and does not undergo the same rigorous enactment process as a statute or administrative regulation." Warner v. United Natural Foods, Inc., No. 1:20CV1758, 2021 WL 120844, at *5 (M.D. Pa. January 13, 2021). The same court acknowledged that although the governor's power to issue the orders derived from the relevant emergency legislative code, the court followed precedent that the public policy exception should apply in "the most limited of circumstances where the termination implicates a clear mandate of public policy." Id. The Maryland court rejected the expansion of a public policy exception to a governor's emergency executive order. Id.
Â¶6 In the same way, the content of Governor Stitt's transitory emergency order did not articulate the sort of well-established clear and compelling norm of conduct that firmly exists in Oklahoma constitutional, statutory, or jurisprudential law. The executive order was temporary (lasting only one month) and was not deliberated by a legislative, administrative, or judicial body. The executive order failed to define "elective surgeries," leaving it to each institution and its patients to determine whether a surgery is elective in nature. See S. Wind Women's Ctr. LLC v. Stitt, 2020 WL 1932900, at *3 (W.D. Okla. April 20, 2020) (finding Executive Order 2020-07 did not specify which surgeries and procedures fall within the postponement of elective surgeries). This conclusion is supported by the recommendations from the Center for Medicare & Medicaid Services (CMS) regarding non-emergent, elective medical services during COVID-19, which assist us in determining the context of Governor Stitt's executive order regarding elective surgeries. The CMS recommendations suggested a framework for local healthcare delivery systems, doctors, and patients to consider in delaying a procedure. It included analyzing the risk and benefit of any medical treatment and ensuring the conservation of medical resources.[1] The determination regarding what constituted an elective surgery could vary depending on a surgery performed at a private specialty hospital that was not treating COVID-19 patients--like the one in this case--or a public general hospital that was. And the determination could vary depending on the specific patient and the medical services needed; such inquiry is normally determined within the physician-patient relationship.
Â¶7 Even more, the purpose behind postponing elective surgeries was not necessarily to protect Nurse from an infectious disease while she worked, as the majority contends. Nurse was not even working in a hospital caring for COVID-19 patients. Instead, the postponement was mostly to guarantee there were adequate staffing, beds, and equipment at the hospitals that cared for COVID-19 patients. As demonstrated, the temporary emergency order leaves the parameters of "elective surgeries" an amorphous term, failing to satisfy the requirements under Burk of a clear and well-defined statement of public policy. See Barker v. State Ins. Fund, 2001 OK 94, Â¶ 25, 40 P.3d 463, 470 (holding a statute could not support a Burk claim because the statute did not define "mismanagement").
Â¶8 The majority attempts to dodge the issue of a lack of a clear and well-defined statement of public policy by ruling that the executive order established a broad public policy of curtailing an infectious disease. This holding is overly broad and effectively eliminates the ability for the hospital, physician, and patient to have made decisions regarding elective surgeries during COVID-19, and, in turn, bars necessary surgeries. This is contrary to what federal guidelines, as mentioned, intended for the performance of elective surgeries during COVID-19.
Â¶9 More importantly, our Court has only recognized this type of broad public policy exception regarding infectious diseases in cases where an employer terminated an employee for not attending work while infected with a communicable disease. See Moore, 2016 OK 28, Â¶ 30, 376 P.3d 894, 905; Silver, 2004 OK 1, Â¶ 2, 84 P.3d 728, 729. That is not the case here. The hospital could conduct day-to-day business, and the hospital determined that Nurse's services were necessary. Nurse did not have COVID-19 nor was she exposed to COVID-19. Yet, Nurse refused to show up to work. To refuse to attend work as an essential employee (who is healthy) due to the possibility of contracting COVID-19 (or any other communicable disease) and then be terminated does not rise to the level of this public policy exception.
Â¶10 The threat of COVID-19 still exists today. Allowing such a broad public policy as the basis for a Burk claim will create uncertainty for an employer trying to ascertain its precise meaning in determining whether an action for violation of the public policy exists. And ultimately eroding the right of employers to manage their businesses on a day-to-day basis.
Â¶11 Our Court has never allowed an emergency executive order as the basis for a Burk tort claim. And it is apparent that an emergency executive order cannot set public policy. As noted by the majority, the legislative branch sets the public policy by enacting law that does not conflict with the Oklahoma Constitution. Treat v. Stitt, 2020 OK 64, Â¶ 4, 473 P.3d 43, 44. Although the Legislature delegated to Governor Stitt the power to implement emergency orders through the Oklahoma Emergency Management Act, the content of the emergency orders does not automatically contain a clear and compelling public policy, just like not every statute contains a clear and compelling public policy to support a Burk claim. Reynolds, 2009 OK 97, Â¶ 18, 232 P.3d at 913 (holding that the statutory sources cited by the employee did not articulate the relevant public policy to support the employee's Burk claim). Declaring that a violation of a provision of the emergency executive order regarding a postponement of elective surgeries was a violation of public policy and, therefore, fits within the exception to at-will employment articulated in Burk is not supported by Oklahoma law. For these reasons, I respectfully dissent.
FOOTNOTES
[1] See Centers for Medicare & Medicaid Services, Non-Emergent, Elective Medical Services, and Treatment Recommendations 1 (April 7, 2020), available at https://www.cms.gov/files/document/cms-non-emergent-elective-medical-recommendations.pdf.

ROWE, J., dissenting:
Â¶1 The majority's opinion expands the scope of the public policy exception to at-will employment, which we have heretofore tailored very narrowly in Burk and its progeny.
Â¶2 In order to invoke the public policy exception to at-will employment, Plaintiff must show, among other things, that her termination was contrary to a clear mandate of public policy articulated in constitutional, statutory, or jurisprudential law. In order to satisfy this requirement, the majority notes that the Governor's authority to issue emergency orders like those at issue in this case is authorized by statute. See Oklahoma Emergency Management Act of 2003, 63 O.S. Â§Â§ 683.2, 683.9; Catastrophic Health Emergency Powers Act, 63 O.S. Â§ 6403.
Â¶3 In this instance, however, we must distinguish between the two public policies at work here. The first is the very broad public policy by which the legislature conferred special emergency powers to the Governor to respond to a public health crisis; the second consists of the directives in the Governor's emergency orders aimed at resolving the specific public health crisis the State was facing in March and April of 2020. Plaintiff's termination could only have violated the latter, which although encompassed within an emergency order issued pursuant to statutory authority, does not rise to the level of constitutional, statutory, or jurisprudential law, as Burk mandates.
Â¶4 In reaching its result, the majority has expanded the scope of public policies which can support an exception to the at-will employment doctrine. The narrowly circumscribed exception that we recognized in Burk, which was limited to clear mandates of public policy expressed in constitutional, statutory, or jurisprudential law, now includes any and all provisions set out in emergency orders issued by the Governor during a public crisis. This approach disregards the guidance in Burk that "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." Burk v. K-Mart Corp., 1989 OK 22, Â¶ 18, 770 P.2d 24, 28-29 (quoting Parnar v. American Hotels, Inc., 652 P.2d 625, 631 (Haw. 1982)).
Â¶5 Finally, the Plaintiff has failed to identify any other clearly established public policy that her termination would violate. Plaintiff claims that her termination violates public policy as expressed in the Oklahoma Occupational Health and Safety Standards Act ("OOHSSA"). See 40 O.S. Â§ 401 et seq. However, we have previously recognized that the OOHSSA no longer applies to private employers. See Griffin v. Mullinix, 1997 OK 120, Â¶ 12, 947 P.2d 177, 179. Thus, it is of no help to Plaintiff.
Â¶6 Plaintiff also suggests that Oklahoma law imposes a general duty on employers to provide a reasonably safe workplace, relying on two cases involving the termination of nursing home employees. See Silver v. CPC-Sherwood Manor, Inc., 2004 OK 1, 84 P.3d 728; Moore v. Warr Acres Nursing Center, LLC, 2016 OK 28, 376 P.3d 894. In both cases, the plaintiffs were able to identify specific public policies, expressed in statute and regulations, which were undermined by their firing.[1] Neither case established a duty on behalf of an employer to provide a reasonably safe workplace.
Â¶7 I see no cognizable legal claim under which Plaintiff can prevail. Accordingly, I respectfully dissent to the majority's holding, which reverses the trial court's dismissal.
FOOTNOTES
[1] In Silver, a nursing home cook was fired for leaving work without permission after he developed diarrhea and began vomiting during his shift. Silver v. CPC-Sherwood Manor, Inc., 2004 OK 1, Â¶ 2, 84 P.3d 728, 728. We found that an exception to the at-will employment doctrine was warranted because requiring the plaintiff to continue working would violate 63 O.S. Â§Â§ 1-1102 and 1-1109, provisions of the Public Health Code, which prohibited the serving of food that was prepared under unsanitary conditions. Id. Â¶Â¶ 6-7, 84 P.3d at 730.
In Moore, an LPN was fired for calling in sick after being diagnosed with influenza. Moore v. Warr Acres Nursing Center, LLC, 2016 OK 28, Â¶Â¶ 3-5, 376 P.3d 894, 895-96. We found that an exception to the at-will employment doctrine was warranted because requiring the plaintiff to attend work at a nursing home after being diagnosed with influenza would violate, among other things, Oklahoma Department of Health Regulations enacted pursuant to the Nursing Home Care Act, which required nursing homes to exclude personnel and visitors carrying communicable diseases. Id. Â¶Â¶ 25-30, 376 P.3d at 901-05.